# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

AUSTIN D.[1],

                                        Plaintiff,

         v.                                              5:17-CV-881 (ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

STEVEN R. DOLSON, ESQ., for Plaintiff
SUSAN REISS, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## MEMORANDUM-DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment,

pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in

accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y.

Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 6).

## I.    PROCEDURAL HISTORY

Plaintiff protectively filed[2] an application for Supplemental Security Income

---

[1] In accordance with recent guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in June 2018 in order to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify the plaintiff using only her first name and last initial.

[2] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. §§ 404.630, 416.340. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a later date.

("SSI") on March 17, 2014, alleging disability beginning February 4, 2014, due to Autism Spectrum Disorder ("ASD"), Asperger's, Obsessive Compulsive Disorder ("OCD"), Anxiety, and Agoraphobia. (Administrative Transcript ("T") at 140, 157). Plaintiff's application was denied initially on May 7, 2014. (T. 73-76, repeated at 77-80). Plaintiff requested a hearing, which was held on November 23, 2015 before Administrative Law Judge Robert E. Gale. (T. 29-60). Plaintiff and a vocational expert ("VE") testified at the hearing. (*Id.*) On February 19, 2016, ALJ Gale issued his decision, finding that plaintiff was not disabled. (T. 13-24). The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on July 20, 2017. (T. 1-4).

## II. GENERALLY APPLICABLE LAW

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

2

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

## B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more

than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.   FACTS

As of the date of his administrative hearing, plaintiff was 25 years old.[3] (T. 32). Plaintiff lives at home with his parents. (T. 33). Plaintiff does not drive a car, but does

_____

[3] Plaintiff was born in May 1990, and was 23 at the time that he filed for SSI benefits. (T. 140).

4

have a learner's permit. (*Id.*)  Plaintiff testified that his anxiety prevents him from using public transportation, and that his parents drive him everywhere he needs to go. (*Id.*) Plaintiff obtained a Regent's diploma from high school, ranking 329 out of 523 students. (T. 34).  After high school, plaintiff attended Onondaga Community College ("OCC") and graduated cum laude with an Associates' Degree in "computer information systems." (T. 35).  Plaintiff told the ALJ that he had a computer at home, he could use a computer and "program simple programs," but that he had not done "any real computer work in a couple years." (T. 34).

Plaintiff testified that his most significant impairment was Autism, followed by anxiety, and OCD. (T. 36-37).  Plaintiff stated that he feels anxious, and that he is unable to touch "very dirty stuff or chemicals" because of his OCD. (T. 37).  Plaintiff told the ALJ that he met with his psychologist every two to three weeks for the last five years. (T. 38).

Plaintiff stated that on a typical day, he woke up at 7:00 a.m. and made his own breakfast. (T. 39).  He ate cereal,[4] and either he or his mother made "homemade frappuccino." (T. 39).  After breakfast, plaintiff spends most of his time in his room, watching television, playing video games, or "browsing the internet." (T. 39).  Plaintiff testified that he could safely walk around the neighborhood, choose the appropriate clothes to wear for the weather, and navigate a department store. (T. 40).  However,

---

[4] When plaintiff's counsel asked him about the type of cereal he ate, plaintiff stated that he always ate "Cinnamon Life," and had not eaten a different cereal for "months." (T. 44).  However, he also testified that he ate so much Cinnamon Life because of "taste and fiber," and that if his parents took him out to breakfast, he would eat oatmeal. (T. 45).

plaintiff stated that he would have trouble speaking with the cashier at the store,[5] and he could not pay bills without assistance. (T. 43, 47). Plaintiff also stated that he only took dry clothes out of the drier and clean dishes out of the dishwasher because he did not want to touch wet clothes or dirty dishes. (T. 41).

Plaintiff stated that he could make a sandwich, and he could use a toaster and a microwave, but not an oven. (T. 41-42). Plaintiff testified that he bathed[6] and brushed his teeth regularly, but he relied on someone else to cut his hair. (T. 42). Plaintiff relied on his mother to help him shave. (T. 42). Plaintiff stated that even though he used an electric razor, he was worried that it might "slip." (*Id.*) Plaintiff also testified that sometimes he needed reminders to brush his teeth. (T. 48). He has no trouble dressing himself, but does not like patterns because they are "distracting." (T. 49).

Plaintiff also testified that he knew that he should shower before going out for breakfast with his parents, but that he would have to be told "many days earlier," and that he would "feel anxious" about the outside trip because he does "not like spontaneity." (T. 45). Plaintiff does not have any friends, but he does go to church and participates in the "food pantry" with his mother. (T. 46). Plaintiff stated that he could perform the work himself "as long as [his mother] is there most of the time" because he did not like being away from either of his parents for a long time. (*Id.*)

Plaintiff testified that his parents drove him to OCC every day, and that he was a

---

[5] Plaintiff testified that he would know how much money to give the cashier and would understand the "appropriate amount of change." (T. 47). He stated that he would not have "any problem with the money." (T. 48).

[6] He also testified that he did not have a problem changing the time that he showered. (T. 49).

full-time student. (T. 50). He stated that he was able to interact with the other students in class "a little bit." (*Id.*) There were some "team activities" in which plaintiff spoke to, and worked together with, two to five people, "either for a program or a PowerPoint presentation." (T. 51). Plaintiff stated that he had no difficulty with that interaction, and he was also able to speak with his professors; but he did not socialize with anyone after school. (T. 50-51).

The ALJ heard testimony from VE DeTrinco. (T. 51-59). The ALJ asked the VE two hypothetical questions. (T. 53-56). In response to the ALJ's second hypothetical question, the VE stated that she found three jobs that plaintiff could perform: data examination clerk, digitizer organizer, and computer operator. (T. 55-56). However, the VE testified in response to counsel's question that each of the positions that she listed "require some degree of change." (T. 57). The jobs ranged from semi-skilled to skilled and would require an individual to "consider and accommodate changes," including being current with technology. (T. 58-59). The VE testified that if the individual could not accommodate those changes, it would eliminate all the jobs that she listed. (*Id.*)

The ALJ's decision and the parties' pleadings provide a detailed statement of the medical and other evidence of record. (T. 14-24). Rather than reciting this evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff.

## IV.  THE ALJ'S DECISION

At step one of the sequential analysis, the ALJ found that plaintiff has not

engaged in substantial gainful activity since his onset date.[7] (T. 14).  The ALJ then found at step two that plaintiff's ASD and his OCD were severe impairments. (*Id.*)  At step three, the ALJ found that plaintiff does not have an impairment or combination of impairments whose severity would meet or equal the severity of a Listed Impairment. The ALJ considered Listings 12.06 (Anxiety and OCD) and 12.10 (ASD). (T. 14-16).[8]

At step four, the ALJ found that plaintiff had the physical RFC to perform a full range of work at all exertional levels. (T. 17).  Mentally, the ALJ found that plaintiff could understand and perform simple and some more complicated tasks, which are performed on a repetitive basis, in a position for which plaintiff has been trained. Plaintiff would be required to have consistent job duties.  He could work in small groups of less than five people, have only rare interaction with the public, and with no requirement that he supervise or manage the work of others. (*Id.*)  Finally, plaintiff would be off task 4% of the work day. (*Id.*)  In making this determination, the ALJ weighed the medical evidence, as well as the plaintiff's IQ test scores and academic performance. (T. 17-22).

At step five, the ALJ relied upon the testimony of the vocational expert in addition to all the evidence in the record to determine that plaintiff could perform jobs that existed in significant numbers in the national economy. (T. 23-24).  Thus, the ALJ

---

[7] The plaintiff has never engaged in substantial gainful activity because he has never been employed.

[8] Although plaintiff argued at the ALJ hearing that he met Listing 12.10, he no longer makes that argument.  This court agrees that the ALJ's finding in that regard is supported by substantial evidence.  Thus, the court will not engage in a lengthy discussion of the reasons supporting the ALJ's finding that plaintiff's impairments failed to reach listing severity and will incorporate, by reference, the ALJ's decision at T. 14-16.

found that plaintiff was not disabled. (T. 24).

## V.  ISSUES IN CONTENTION

Plaintiff raises the following argument:

1.  The ALJ's determination was not supported by substantial evidence due to the ALJ's failure to properly evaluate the treating physician's opinion. (Pl.'s Br. at 4-9) (Dkt. No. 9).

Defendant argues that the Commissioner's determination was supported by substantial evidence and should be affirmed. (Def.'s Br. at 3-12) (Dkt. No. 12). For the following reasons, this court agrees with the defendant and will dismiss the complaint.

## DISCUSSION

## VI.  RFC EVALUATION/TREATING PHYSICIAN

### A.  Legal Standards

#### 1.  RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis . . . ." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R

§§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999)

(citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  An ALJ must

specify the functions plaintiff is capable of performing, and may not simply make

conclusory statements regarding a plaintiff's capacities.  *Martone*, 70 F. Supp. 2d at

150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*,

737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y.

1987)).  The RFC assessment must also include a narrative discussion, describing how

the evidence supports the ALJ's conclusions, citing specific medical facts, and non-

medical evidence.  *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6

(N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL

374184, at *7).

### 2.    Treating Physician

"Although the treating physician rule generally requires deference to the medical

opinion of a claimant's treating physician, . . . the opinion of the treating physician is

not afforded controlling weight where . . . the treating physician issued opinions that

are not consistent with other substantial evidence in the record . . . ."  *Halloran v.*

*Barnhart*, 362 F.3d 28, 32 (2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002);

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  The ALJ must properly analyze the

reasons that a report of a treating physician is rejected.  *Halloran*, 362 F.3d at 32-33.

An ALJ may not arbitrarily substitute his own judgment for competent medical opinion.

*Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

## B.     Application

In this case, plaintiff alleges that the ALJ failed to give proper weight to the opinions of plaintiff's treating psychologist, Dr. Griffiths, and plaintiff's primary care physician, Dr. Noonan, while giving greater weight to the opinions of the consultative psychologists, Dr. Shapiro,[9] Dr. Noia,[10] and Dr. Harding (a non-examining medical expert).  The ALJ gave Dr. Griffiths's and Dr. Noonan's opinions "little weight," while giving Dr. Shapiro's opinion "great weight," Dr. Noia "some weight," and Dr. Harding "some weight."[11] (T. 19-22).  Plaintiff claims that the ALJ did not "comprehensively" set forth his reasons for finding that the treating sources' opinions were not supported by the medically acceptable clinical and laboratory diagnostic techniques. (Pl.'s Br. at 6).

This court does not agree.  The ALJ carefully discussed each source's medical opinion in determining the plaintiff's RFC. (T. 17-22).  In addition to their narrative progress notes, Dr. Griffiths and Dr. Noonan submitted medical source statements ("MSS") in which they rated plaintiff's limitations. (T. 339-345, 385-87, 401-403). Only one of these reports is in narrative form, and it is written by Dr. Griffiths. (T. 339-

---

[9] Dr. Shapiro examined the plaintiff on November 13, 2015. (T. 431-35).

[10] Dr. Noia examined the plaintiff on April 21, 2014. (T. 346-49).

[11] Dr. Harding did not examine plaintiff, but Dr. Harding's report is dated May 6, 2014. (T. 62-70).  Dr. Harding states that he reviewed various reports, including those by Dr. Griffiths and Dr. Noonan, which were written at the time. (T. 63-64).  The ALJ rejected the portion of Dr. Harding's report which stated that plaintiff was "moderately" limited in his ability to understand, remember and carry out "detailed" instructions; in his ability to perform activities within a schedule; maintain regular attendance; and be punctual within customary tolerances. (T. 22, 66-67).  The ALJ found that based on his educational performance, including his IQ scores, he would not be so restricted. (T. 22).

45).  The other two reports–one from Dr. Noonan and one from Dr. Griffiths–were check-box forms. (T. 385-87, 401-403).

In Dr. Noonan's August 17, 2015 check-box MSS, he found that plaintiff had marked restrictions in many areas, including in his ability to maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance; be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with, and in proximity to, others without being distracted by them; make simple work-related decisions; complete a normal workday and work week without an unreasonable number and length of rest periods; interact appropriately with the general public; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; maintain socially-appropriate behavior; adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; travel in unfamiliar places; use public transportation; and set realistic goals or make plans independently of others. (T. 21) (citing T. 401-402).

In the same report, Dr. Noonan found that plaintiff had qualitative deficits in reciprocal social interaction, a markedly restricted repertoire of activities and interests, marked difficulties in maintaining social functioning, and repeated episodes of decompensation, each of extended duration. (T. 401).  However, Dr. Noonan did not check the box indicating marked restriction in plaintiff's activities of daily living. (T. 385).  The ALJ found that Dr. Noonan's notes did not support the extreme restrictions listed in his MSS.  The clinical findings during the consultative examinations also

showed that plaintiff was not as limited as Dr. Noonan suggested.[12] (T. 21-22). The ALJ also cited the plaintiff's activities of daily living and "academic achievements" as showing that plaintiff was not as limited as Dr. Noonan suggested.[13] (T. 22).

Dr. Noonan's report was inconsistent with Dr. Griffiths's October 14, 2015 check-box MSS, where he found that plaintiff also had marked restriction in his activities of daily living, but did not suffer from repeated episodes of decompensation. (T. 385). There is absolutely no evidence in the record that plaintiff suffered from repeated episodes of decompensation "each of extended duration" as Dr. Noonan stated in his August 17th report. (T. 401). In addition, Dr. Noonan's progress notes refer to one of plaintiff's impairments as "hi functioning autism." (T. 395). Dr. Noonan also prescribed Zoloft for plaintiff's OCD. (*Id.*) On March 18, 2015, Dr. Noonan noted that plaintiff had just joined a gym, that he went "a couple of times," and that he planned to make it "a routine." (T. 395). Dr. Noonan stated that plaintiff was walking for exercise, and walked the "mall" when the weather was inclement. (T. 395). In July of 2014, Dr. Noonan stated that plaintiff walked three miles two to three times per week; otherwise he kept to his bedroom. (T. 396). Plaintiff would not go grocery shopping, but would

---

[12] In *Halloran v. Barnhart*, 362 F.3d 28, 31 n.2 (2nd Cir. 2004), the Second Circuit noted the "limited value of the standardized check-box forms, which are considered only marginally useful for purposes of creating a reviewable factual record." *See Sabater v. Colvin*, No. 12-CV-4594, at *5 n.6 (S.D.N.Y. Mar. 10, 2016) (citing cases, including *Halloran, supra*). There are case, holding that check-the-box questionnaires are a proper format for a treating physician to express an opinion. *Goble v. Colvin*, No. 15-CV-6302, 2016 WL 3179901, at *5 (W.D.N.Y. June 8, 2016) (citations omitted). This court does not question that check-the-box forms are widely used and are not invalid simply because of the nature of the form; however, in this case, the forms were inconsistent with the medical professionals' narrative reports and the other evidence of record. Thus, the ALJ's decision to give little weight to these reports is supported by substantial evidence.

[13] Dr. Noonan is plaintiff's primary care physician and not a mental health professional.

go to Shoppingtown or the Great Northern Mall. (T. 396). Clearly, plaintiff was leaving his home to walk outdoors and at the mall, and was not as restricted as Dr. Noonan's check-box form indicated. (T. 396). In a progress note dated July 29, 2013, Dr. Noonan noted that plaintiff did some work at the Samaritan Center, he continued to lose weight, his anxiety level was down because his medication was "effective."[14] (T. 332).

Dr. Noonan also checked the box indicating that plaintiff was moderately limited in his ability to remember locations and work-like procedures, understand and remember short and simple instructions, remember detailed instructions, and carry out very short and simple instructions. (T. 401). This is inconsistent with Dr. Griffiths's opinion that plaintiff was not significantly limited in his memory or his ability to understand and remember short and simple instructions, but had a moderate limitation in the ability to understand and remember detailed instructions and the ability to carry out very short and simple instructions. (T. 385). In Dr. Griffiths's April 2, 2014 narrative report for the New York State Office of Temporary and Disability Assistance, he indicated that plaintiff had "no limitation" in understanding and memory. (T. 344).

Both treating source's MSS opinions were inconsistent with the consultative reports. Neither of the examining consultative psychologists found any limitations in plaintiff's memory or attention. (T. 348, 433). Dr. Noia and Dr. Shapiro found that plaintiff's attention, concentration, and both recent and remote memory were "intact," and plaintiff was able to do counting, simple calculations and serial 3s. (T. 348, 433).

---

[14] Dr. Noonan referred to the medication as Sertraline. (T. 332). "Zoloft" is a brand name for Sertraline. https:// www.rxlist.com/consumer_sertraline_zoloft/drugs-condition.htm.

14

Dr. Shapiro stated that plaintiff's cognitive functioning was in the "average range," and his general fund of information was "appropriate to experience." (T. 433). Dr. Noia agreed that plaintiff's intellectual functioning was in the average range and general fund of information appeared to be moderately adequate. (T. 348). Dr. Noia stated that "vocationally, the claimant appears to have no limitations in understanding and following simple instructions and directions. (T. 348-49). Dr. Noia found that plaintiff's other limitations were in the mild to moderate range, including mild limitations in the ability to learn new tasks. (T. 349).

It is clear that plaintiff does have social limitations, and the ALJ accepted the fact that plaintiff had symptoms and limitations, but found that plaintiff had failed to produce appropriate evidence to show the extent of those symptoms. (T. 17). In her 2015 report, Dr. Shapiro stated that plaintiff would have mild to moderate limitations in his ability to deal with stress and change, while in 2014, Dr. Noia found that plaintiff had a "marked" limitations in his ability to deal with stress. The ALJ accepted Dr. Shapiro's assessment of plaintiff's ability to deal with stress, while stating that he rejected Dr. Noia's assessment of the plaintiff's inability to deal with stress based upon plaintiff's ability to earn an associates degree and graduate cum laude. (T. 19).

The ALJ is entitled to accept parts of a medical source's report while rejecting other parts if the analysis is supported by substantial evidence. It was the province of the ALJ to resolve the conflicts in the evidence and to determine plaintiff's RFC based on the evidence. *Anselm v. Commissioner*, No. 17-2948, __ F. App'x __, 2018 WL 2901334, at *3 (2d Cir. June 11, 2018) (citing inter alia *Veino v. Barnhart*, 312 F.3d at

588-89; *Mongeur*, 722 F.2d at 1038). The court defers to such resolution. *Id.* (citation omitted). The ALJ incorporated plaintiff's limitations into the RFC. The ALJ accepted some of the opinions of plaintiff's treating mental health professionals; but rejected the conclusory opinions that were excessively restrictive compared to their treatment notes and the plaintiff's daily activities. The ALJ's decision is not required to perfectly correspond with any of the opinions of medical sources cited in his decision, and he may accept portions of the medical records while rejecting others in order to make an RFC determination that is "consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013). In this case, the ALJ balanced conflicting evidence and found that the consultative sources' reports, particularly Dr. Shapiro's report, were more consistent with the record as a whole.

Plaintiff argues that the ALJ was not entitled to rely upon plaintiff's daily activities, nor his ability to finish school. However, in *Rapaport v. Commissioner of Social Security*, No. 16-CV-2617, 2018 WL 3122056, at *3-4 (S.D.N.Y. June 26, 2018), the court specifically held that the ALJ was correct in considering the inconsistency of the treating physician's opinion with plaintiff's educational and vocational success. (citing *Evans v. Comm'r of Soc. Sec.*, 110 F. Supp. 3d 518, 535 (S.D.N.Y. 2015) (finding that the ALJ could properly use the plaintiff's academic history as a factor in making the determination as to her mental abilities); *Walters v. Astrue*, No. 10-CV-01038T, 2013 WL 1755727, at *8 (W.D.N.Y. Apr. 24, 2013) (holding that the ALJ properly considered that plaintiff's "mental impairments did not prevent him from successfully going to school and obtaining an associate's degree");

*Goodale v. Astrue*, 32 F. Supp. 3d 345, 355 (N.D.N.Y. 2012) (noting that plaintiff's "ability to attend and successfully complete a college course of study suggests that his fatigue did not result in a marked limitation")). Thus, the ALJ properly relied, in part, on plaintiff's graduation from community college with a cum laude associate's degree. Among other things, this achievement by plaintiff is inconsistent with an inability to follow simple or more complicated directions, deal with a degree of stress, or learn new tasks.

Plaintiff also argues that the ALJ was incorrect in finding that plaintiff was not in special education in high school. Plaintiff cites T. 404 and T. 429. However, the ALJ was correct. Plaintiff was not in special education in high school and obtained a Regent's Diploma. In fact, one of the pages cited by plaintiff is a note from the Special Education Resource Teacher from plaintiff's ninth grade class, stating that plaintiff received "Resource Services" at Liverpool High School since September of 2005, but that

> "[s]ince that time he has received grades of 81-92 with commendable comments. In the Resource Room, he has never had the need to use his test mods as I have never received a test for him to finish. He also does not ask for assistance in any academic area and is reluctant to let me even look over his completed work. He is very conscientious about completing homework so rarely has any work to do during Resource except for an occasional math assignment. He is not a behavior problem but an intelligent, respectful young man.

(T. 429). The recommendation was that, due to these observations "and a lack of need," it was in plaintiff's best interest to "place him in the less restrictive environment of Consult services. (*Id.*) Although Dr. Shapiro's report stated that plaintiff was in

special education due to autism (T. 431), Dr. Noia's report states that plaintiff was in "regular education with resource and test modifications." (T. 346). From the teacher's note cited above, it appears that Dr. Noia and the ALJ were correct in stating that plaintiff was not in special education in high school. In any event, *all* plaintiff's IQ scores were in the average to above-average range. (T. 434).

The ALJ also noted that in his April 2, 2014 report, Dr. Griffiths found that plaintiff "has been unable to function in work settings due to poor tolerance for social interaction & rigidity of thinking." (T. 343). However, plaintiff has never attempted to work, and thus, it is unclear to what Dr. Griffiths was referring. Dr. Griffiths also stated that plaintiff had no "experience" handling money. (T. 343). The ALJ pointed out that plaintiff's lack of experience with money did not indicate his inability to learn to handle money, given his ability to learn and understand. (T. 21). Plaintiff testified at his hearing that he could find his way to the men's section of a department store to buy a jacket, and that although he would have his mother pay for the jacket if she were with him, he would be "able" to have the interaction with the cashier himself. (T. 46-47). Plaintiff then stated that he would have "difficulties" with the conversation. (T. 47). Plaintiff clarified his statement by testifying that he would not have trouble with the money, he had trouble socializing. (T. 48).

Although plaintiff has trouble "socializing," he testified that when he was a full-time student at OCC, he spoke with his professors, and interacted with other students in class. (T. 50). Plaintiff also stated that in some of his computer classes, there were "two to five people that I had to talk with and work together either for a program or a

PowerPoint presentation." (T. 51). Plaintiff told the ALJ that he had ***no*** difficulty with that type of interaction, even though he did not socialize with these classmates after school. (*Id.*) On March 18, 2015, Dr. Noonan stated that plaintiff joined a gym two weeks prior to his appointment and went "a couple of times." (T. 395). Plaintiff told Dr. Noonan that he planned to make the gym a "routine." (*Id.*) In a progress note dated June 10, 2015, Dr. Griffiths stated that the best way to overcome plaintiff's fear about social situations was to place him in social situations, regardless of the discomfort.[15] (T. 367).

The ALJ accepted that plaintiff had limitations and incorporated those limitations into his RFC, including proposing that plaintiff not work in groups of more than five people as he had when he was in college, and that he have only "rare" interaction with the public. (T. 17). The ALJ also accepted that plaintiff's work tasks should be "repetitive" in a field in which he was trained. (*Id.*) Finally, addressing plaintiff's dislike of "change," the ALJ's RFC included a restriction that plaintiff's job duties were "consistent." (*Id.*)

Plaintiff argues that the ALJ did not specifically consider each factor outlined in 20 C.F.R. § 404.1527(c) because he did not comment on the nature and extent of the treating relationship, and he did not discuss the consistency of the opinion with the other medical sources. (Pl.'s Br. at 7). However, the ALJ need not explicitly consider

---

[15] The court notes that when plaintiff was interviewed for his initial Social Security application, the interviewer's "observations" include a finding that plaintiff was "slow but was polite and friendly." (T. 154). He only became "very anxious" when his mother began talking about him and his condition. (*Id.*) Plaintiff argued with his mother and said "no no no a lot if he didn't like what she was saying." (*Id.*)

each factor, as long as he or she gives good reasons for the weight accorded to the treating physician's opinion. *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order); *Cavazos v. Berryhill*, No. 6:17-CV-6852, 2018 WL 6721312, at *6 (W.D.N.Y. Dec. 21, 2018); *Gonzalez v. Berryhill*, No. 3:17-CV-1809, 2018 WL 6616819, at *7 (D. Conn. Dec. 18, 2018).

In addition, the ALJ did give "good reasons" for discounting the treating physicians' medical source statements. In doing so, the ALJ discussed the findings of the consultative physicians, as well as plaintiff's educational performance[16] when determining to give less weight to the treating sources' opinions. The opinions of non-examining and consulting sources may override treating sources when they are supported by evidence in the record. *Gonzalez v. Colvin*, No. 1:15-CV-767, 2018 WL 1040250, at *4 (W.D.N.Y. Feb. 24, 2018) (citation omitted); *Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018) (citing *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995)). In *Smith*, the court held that even though the ALJ failed to explicitly follow the treating physician rule, the record and the ALJ's opinion made it clear that the ALJ applied the substance of the rule, and plaintiff received its advantages. 740 F. App'x at 725-26. When the evidence of record permits the court to glean the rationale in an ALJ's decision, he need not reconcile every piece of evidence or explain why he found it unpersuasive. *See Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. (2d Cir. 2013); *Petrie v. Astrue*, 412 F. App'x 401, 407 (2d Cir. 2011).

---

[16] As stated above, plaintiff was ranked 328 out of 583 students in his high school graduating class. (T. 210). Plaintiff's grade point average was 82.220. (*Id.*) The court notes that, although plaintiff testified that he did not cook, he achieved an 81 in a course entitled "Gourmet Cooking." (*Id.*)

Plaintiff also argues that if the ALJ were going to reject the treating physicians, and there was "any ambiguity" in their opinions he should have recontacted the treating sources for "clarification." (Pl.'s Br. at 7) (citing *Rosa v. Callahan*, 168 F.3d 72, 80 (2d Cir. 1999); *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998)). The regulations now provide that the ALJ "may" recontact any medical source where the evidence of record is "'incomplete or inconsistent, including where the evidence is ambiguous.'" *Scott v. Berryhill*, No. 1:17-CV-468, 2018 WL 4442882, at *4 (W.D.N.Y. Sept. 17, 2018)[17] (citing 20 C.F.R. § 404. 1520b(b)(2)(I) and *Bauer v. Comm'r of Soc. Sec.*, No. 16-CV-729, 2018 WL 4181769, at *5 (W.D.N.Y. Aug. 31, 2018)). In this case, the treating physicians' opinions are not ambiguous or incomplete; they conflict with the reports of the consultative physicians, which the ALJ discussed and which were consistent with each other, with exceptions that the ALJ also discussed. Those conflicts in the evidence were for the ALJ to resolve. Thus, the ALJ's decision to reject the restrictive MSSs completed by plaintiff's treating sources in favor of the opinions of two examining consultative physicians is supported by substantial evidence.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the Commissioner's decision is **AFFIRMED**, and plaintiff's complaint is **DISMISSED**, and it is

---

[17] The Court in *Scott* noted that a March 26, 2012 update to 20 C.F.R. § 404.1512 removed a mandatory requirement to recontact a treating physician under particular circumstances. *Scott v. Berryhill*, 2018 WL 4442882, at *4 n.1. This change "reduce[d] the situations in which an ALJ must recontact medical providers." *Id.* (citing *Rolon v. Comm'r of Soc. Sec.*, 994 F. Supp. 2d 496, 505 (S.D.N.Y. 2014) (internal quotation omitted)). The change did not eliminate the ALJ's authorization to recontact the treating physician, and some courts have held that, "the modifications [to the regulation] do not substantively change the ALJ's obligations." *Id.* (quoting *Rolon, supra*)

**ORDERED**, that judgment be entered for **DEFENDANT.**


Dated: January 14, 2019

Hon. Andrew T. Baxter
U.S. Magistrate Judge